Panzino v. 5 Church, Inc., 2020 NCBC 13.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

MAURICE PANZINO,

       Plaintiff,

v.

5 CHURCH, INC.; AND PATRICK WHALEN,

       Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 13865

**ORDER AND OPINION ON
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND
MOTION TO STRIKE**

1. In 2011, a group of investors, including Maurice Panzino, formed 5Church, Inc. to open a restaurant in Charlotte, North Carolina. Over the next few years, some of the investors went on to form new restaurant businesses in Charlotte and other cities in the Southeast. Panzino was not among them. In this action, Panzino alleges that he was wrongfully left out of the restaurant group's expansion—a snub he attributes to 5Church's manager, Patrick Whalen. He also alleges that Whalen and 5Church withheld financial information and distributions from him.

2. Whalen and 5Church have moved for summary judgment on all claims. (*See* ECF No. 28.) They have also moved to strike materials filed by Panzino with his opposition brief. (*See* ECF No. 31.) For the following reasons, the Court **GRANTS** in part and **DENIES** in part the motion for summary judgment and **DENIES** the motion to strike as moot.

> *Bradley Arant Boult Cummings LLP, by Dana C. Lumsden and Johnathan E. Schulz, for Plaintiff Maurice Panzino.*
>
> *Parker Poe Adams & Bernstein LLP, by Eric A. Frick and Eric H. Cottrell, for Defendants Patrick Whalen and 5Church, Inc.*

Conrad, Judge.

# I.
# BACKGROUND

3. The Court does not make findings of fact in ruling on motions for summary judgment. The following background, describing the evidence and noting relevant disputes, is therefore intended only to provide context for the Court's analysis and ruling.

4. The idea for 5Church appears to have originated with Whalen. His plan "was to open a concept" and then to expand "regionally, nationally, and globally if we could." (Pl.'s Ex. C 59:25–60:3, ECF No. 30.4.) To start, Whalen formed 5Church to open and operate a restaurant of the same name in Charlotte, North Carolina. Several investors jumped on board. One was Panzino, who acquired 20% of 5Church's shares in return for providing construction services. (*See* Pl.'s Ex. B 26:14–17, 30:1–8, ECF No. 30.3.) Another was Ayman Kamel, described by Whalen as a "mentor and advisor." (Pl.'s Ex. A 24:2, ECF No. 30.2.) Kamel also received 20% of 5Church's shares. (*See* Pl.'s Ex. A 61:8–11.) The remaining 60% went to MAP Management of Charlotte, LLC ("MAP"), which is now dissolved but at the time served as an investment vehicle for Whalen and a mix of other investors. (*See, e.g.*, Pl.'s Ex. A 60:24–61:3, 65:8–66:15, 100:17–23.)[1]

5. Though formed as a North Carolina corporation, 5Church has been governed much like a limited liability company. The original shareholders entered into a

---

[1] The record as to MAP's ownership is often confusing. (*See, e.g.*, Pl.'s Ex. C 61:6–62:25.) Nevertheless, it is undisputed that MAP initially owned 60% of 5Church's shares. (*See* Defs.' Br. in Supp. 1, ECF No. 29; Pl.'s Opp'n 2, ECF No. 30.)

contract styled as an operating agreement, which vests management authority in a manager (rather than a board of directors) and refers to the owners as members (rather than shareholders). (*See, e.g.*, Defs.' Ex. A §§ 3.1, 4.1, ECF No. 29.2 ["Operating Agrmt."].) The operating agreement also mistakenly refers to 5Church as a limited liability company at times. (*See* Operating Agrmt. § 2.1.) Why the shareholders chose this unusual arrangement is unclear, but no one challenges the validity of the operating agreement, and its terms are central to this dispute.

6. Three sections are especially relevant. First, section 3.12(c) gives each initial shareholder a right of first refusal to invest "[i]n the event of a second business to be opened after the commencement of this business[.]" (Operating Agrmt. § 3.12(c).) Second, section 5.2 requires 5Church's manager to make monthly distributions to shareholders, subject to the company's capital reserve needs. (*See* Operating Agrmt. § 5.2(a).) It is undisputed that Whalen was 5Church's manager. (*See* Operating Agrmt. p.4; Pl.'s Ex. C 59:15.) Third, section 8.4 states that "[t]he Company will deliver to the Members . . . an unaudited statement of income and retained earnings" each month. (Operating Agrmt. § 8.4(a).)

7. It wasn't long before 5Church's investors decided to expand. About a year after opening the first restaurant, they formed Nan & Byron's, LLC to open and operate a second restaurant in Charlotte. (*See* Pl.'s Ex. A 24:5–7.) Panzino chose not to take part. Though offered a chance to invest in Nan & Byron's, Panzino concluded that the terms weren't favorable and turned it down. (*See* Defs.' Ex. C 127:24–128:11, ECF No. 29.4; *see also* Defs.' Ex. D, ECF No. 29.5.) A few months later, Panzino ran

into financial trouble and sold half his shares in 5Church to Kamel, Whalen, or one or more of their family members. (*See* Pl.'s Ex. B 102:24–103:15, 112:11–18.)

8.      Three more businesses followed. In 2014 and 2015, restaurants carrying the 5Church name opened in Charleston, South Carolina and Atlanta, Georgia. Each was organized as a separate limited liability company. (*See* Pl.'s Ex. A 120:13–18; Defs.' Ex. C 146:8–12, 148:20–23, 151:7–13.) In 2017, a fifth business opened, again organized as a new LLC. It was given the name Sophia's Lounge and located next to the original 5Church restaurant in Charlotte. (*See* Pl.'s Ex. A 85:21–86:17.)

9.      The opening of Sophia's Lounge did not sit well with Panzino. He had not been asked to invest in the business, just as he had not been asked to invest in the Charleston expansion before that. (*See* Defs.' Ex. E 2, ECF No. 29.6; Pl.'s Ex. C 291:15–21; Pl.'s Ex. D 3–4, ECF No. 30.5.) Nor had he received the monthly distributions and disclosures of financial information that he believed the operating agreement required. (*See* Pl.'s Ex. B 108:25–109:1, 112:13–18; Pl.'s Ex. K ¶¶ 5–7, ECF No. 30.12.) Feeling "fed up," Panzino sold all his remaining shares to Whalen, Whalen's father, and Kamel in April 2017. (Pl.'s Ex. B 102:22–23, 108:23–110:2.)

10.      Panzino's departure coincided with a falling out between Whalen and Kamel. At some point in 2017, Whalen sold his interest in the Atlanta restaurant, and Kamel was excluded from management of the Charleston restaurant. (*See* Pl.'s Ex. C 80:12–81:24.) And in August of that year, Kamel filed suit against Whalen, 5Church, and others in federal district court. *See Kamel v. 5Church, Inc.*, 2019 U.S. Dist. LEXIS 144287, at *10 (W.D.N.C. Aug. 23, 2019).

11. Panzino brought this suit a year later. He asserts three claims for relief: one for breach of fiduciary duty and constructive fraud against Whalen; another for breach of sections 3.12(c), 5.2, and 8.4 of the operating agreement against Whalen and 5Church; and a third for an equitable accounting against Whalen and 5Church.

12. After discovery closed, Whalen and 5Church moved for summary judgment on all claims. (Defs.' Mot. Summ. J., ECF No. 28.) All briefs were timely filed. The Court held a hearing on September 12, 2019, at which all parties were represented by counsel. The motion is ripe for determination.

## II.
## ANALYSIS

13. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). In deciding a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-mov[ant]," taking the non-movant's evidence as true and drawing inferences in its favor. *Furr v. K-Mart Corp.*, 142 N.C. App. 325, 327, 543 S.E.2d 166, 168 (2001) (internal citation and quotation marks omitted). The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002). If the moving party carries this burden, "it becomes incumbent upon the opposing party to take affirmative steps to defend his position by proof of his own." *Lowe v. Bradford*, 305 N.C. 366, 370, 289 S.E.2d 363, 366 (1982). The opposing party "may not rest

upon the mere allegations or denials of his pleading," N.C. R. Civ. P. 56(e), but must instead "come forward with specific facts establishing the presence of a genuine factual dispute for trial," *Liberty Mut. Ins.*, 356 N.C. at 579, 573 S.E.2d at 124.

A. Breach of Fiduciary Duty and Constructive Fraud

14. In his combined claim for breach of fiduciary duty and constructive fraud, Panzino alleges that Whalen should have but did not disclose plans to open a restaurant in Charleston. (*See* Compl. ¶¶ 52–54, ECF No. 3.) Whalen argues that summary judgment is appropriate because, among other things, he did not owe a fiduciary duty to Panzino. (*See* Defs.' Br. in Supp. 8–12.) Panzino argues that Whalen was 5Church's manager and controlling shareholder and therefore owed a fiduciary duty to Panzino as a minority shareholder. (*See* Pl.'s Opp'n 9–12.)

15. Although Panzino pleads them together, breach of fiduciary duty and constructive fraud are distinct causes of action with overlapping elements. An essential element of each is the existence of a fiduciary relationship. *See, e.g.*, *Azure Dolphin, LLC v. Barton*, 2017 NCBC LEXIS 90, at *23–24 (N.C. Super. Ct. Oct. 2, 2017), *aff'd*, 371 N.C. 579, 821 S.E.2d 711 (2018) (citing examples); *Brown v. Secor*, 2017 NCBC LEXIS 65, at *18–19 (N.C. Super. Ct. July 28, 2017) (same).

16. In his role as 5Church's manager, Whalen effectively held the position of a corporate director or single-director board. By statute, directors owe a fiduciary duty to the corporation, not to individual shareholders or to the shareholders as a whole. *See* N.C.G.S. § 55-8-30. "While it may be said that directors have a general duty to act for the benefit of all shareholders, the General Assembly, in amending the

statutes governing corporations, eliminated the provision that a director's duty runs to both the shareholders and the corporation." *Gusinsky v. Flanders Corp.*, 2013 NCBC LEXIS 43, at *11 (N.C. Super. Ct. Sept. 25, 2013); *see also Estate of Browne v. Thompson*, 219 N.C. App. 637, 641, 727 S.E.2d 573, 576 (2012).

17.     Panzino contends that he and the other shareholders of 5Church altered these statutory rules by contract to impose a fiduciary duty that the manager owes to individual shareholders. (*See* Pl.'s Opp'n 12.) This is an argument that comes more naturally to members of LLCs than corporate shareholders. Although LLC members have nearly limitless authority to depart from statutory default rules, corporate shareholders have far less flexibility. *See Island Beyond, LLC v. Prime Capital Grp., LLC*, 2013 NCBC LEXIS 48, at *15 (N.C. Super. Ct. Oct. 30, 2013) ("Parties to an LLC Operating Agreement can alter statutory default rules, unlike shareholders in a closely held corporation who have no such power."). It bears repeating that, despite having many of the trappings of an LLC, 5Church is organized as a corporation and therefore subject to the statutes that govern corporations. Had 5Church's shareholders intended to impose a nonstatutory fiduciary duty on its manager, their authority to do so might be open to question—an issue that neither side addresses.

18.     The Court need not head down that road because the relevant provision, section 4.8(a), does not purport to do what Panzino contends. Section 4.8(a) is an *exculpatory* provision:

> To the fullest extent permitted [by governing law], the Manager . . . shall not be personally liable, responsible or accountable in damages or

otherwise to the Company or any of its Members or Holders for or with respect to any action taken or failure to act on behalf of the Company within the scope of the authority conferred on the Manager by this Agreement or by law. In addition to, and not by way of limitation of, the preceding sentence, the Manager shall not be liable to the Company or its Members or Holders for monetary damages for breach of fiduciary duty as a Manager, except for liability for acts or omissions not in good faith or which involve fraud, gross negligence, or willful misconduct.

(Operating Agrmt. § 4.8(a).) In his opposition brief, Panzino crops the first sentence in its entirety, omits the introduction to the second sentence, and then reads the last clause in isolation to impose new fiduciary duties by implication. (*See* Pl.'s Opp'n 12.) That is not a reasonable interpretation. On its face, section 4.8(a) limits the manager's liability. At no point does it define the manager's fiduciary duties or state that the manager owes those duties to 5Church's shareholders. It would be nonsensical to construe this express limitation on liability in a way that not only creates liability but does so for new, unusual, and undefined duties. Thus, given the undisputed facts, Whalen did not owe a fiduciary duty to 5Church's shareholders based on his role as manager. *See Atkinson v. Lackey*, 2015 NCBC LEXIS 21, at *9–10 n.1 (N.C. Super. Ct. Feb. 27, 2015).[2]

19. Panzino also points to fiduciary relationships that sometimes arise between shareholders. The general rule is that shareholders "do not owe a fiduciary duty to each other or to the corporation." *Freese v. Smith*, 110 N.C. App. 28, 37, 428 S.E.2d 841, 847 (1993). An exception is that "[t]he controlling majority of the stockholders

---

[2] To be clear, the Court offers no opinion as to whether this exculpatory provision is effective to eliminate the manager's liability for breach of a statutory fiduciary duty to 5Church. *See* N.C.G.S. § 55-8-30(e) ("A director's personal liability for monetary damages for breach of a duty as a director may be limited or eliminated only to the extent permitted in G.S. 55-2-02(b)(3) . . . .").

of a corporation, while not trustees in a technical sense, have a real duty to protect the interests of the minority in the management of the corporation . . . ." *Gaines v. Long Mfg. Co.*, 234 N.C. 340, 344, 67 S.E.2d 350, 353 (1951).

20. In his opposition brief and in his complaint, Panzino asserts that Whalen should be deemed a controlling shareholder because he controlled MAP and MAP, in turn, held a majority of 5Church's shares. (*See* Pl.'s Opp'n 9–10; *see also* Compl. ¶ 17 ("MAP . . . is the controlling shareholder of" 5Church); Compl. ¶ 50 (alleging existence of fiduciary duty based on "Whalen's status as manager of the controlling shareholder of" 5Church).) This is a nonstarter. Perhaps MAP, as majority shareholder, owed a duty to protect the interests of Panzino and other minority shareholders. But no claim has been asserted against MAP, which is an entity distinct from its members, including Whalen. *See* N.C.G.S. § 57D-2-01(a). Panzino has not argued that MAP is Whalen's alter ego. Nor has he cited any case law imputing a majority shareholder's fiduciary status to the shareholder's own managers, officers, or directors. The Court therefore concludes that Whalen's affiliation with MAP is not sufficient to create a fiduciary relationship between Whalen and Panzino.

21. At the hearing, Panzino's counsel offered a new theory: that Whalen was a minority shareholder in his own right and that he owed a fiduciary duty to the other shareholders because he exercised actual control over 5Church. This belated theory is not mentioned in Panzino's brief and is contrary to the allegations of his complaint. It is doubtful whether the issue was properly raised. *See, e.g., Coleman v. Coleman,*

2015 NCBC LEXIS 114, at *8–9 (N.C. Super. Ct. Dec. 10, 2015) (concluding that complaint did not give fair notice of unasserted theory of liability).

22. Furthermore, our Supreme Court has not decided whether a minority shareholder exercising actual control over a corporation owes a duty to other shareholders. *See Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 616, 821 S.E.2d 729, 737 (2018). There is no need to decide that question here. At most, Whalen owned 20.75% of 5Church's shares in 2014 when the Charleston restaurant opened.[3] (*See* Defs.' Ex. F 249:1–16, ECF No. 29.7.) Yet the operating agreement requires a unanimous vote of all shareholders on numerous matters, some big (authorizing a merger or change of form) and some relatively small (authorizing loans over $10,000). (*See* Operating Agrmt. §§ 4.1(a)(ix), 4.3.) These contractual restrictions, which gave Panzino and the other shareholders veto power on key issues, defeat any claim that Whalen exercised actual control over 5Church, as contemplated in *Corwin*. *See Corwin*, 371 N.C. at 619, 821 S.E.2d at 739 (discussing restrictions that require "unaffiliated stockholders to approve specific transactions," among others).

23. In short, Panzino has not put forward evidence from which a jury could find that Whalen owed him a fiduciary duty. Accordingly, the Court grants the motion for

---

[3] There is scant evidence on this point—an artifact of Panzino's belated assertion of a theory not grounded in his complaint. Nothing in the record shows that Whalen owned these shares in his own name, and some evidence suggests that Whalen held many of the shares through his stake in MAP and that he held an interest in other shares that were placed in the name of Kamel's wife. (*See* Pl.'s Ex. A 61:12–63:9; Pl.'s Ex. B 102:24–103:15.) Whalen acquired other shares when Panzino sold the rest of his stake in 2017, but that purchase is not material to the alleged breach in 2014.

summary judgment as to Panzino's claims for breach of fiduciary duty and constructive fraud.

## B. Breach of Contract

24.    Next, the Court addresses Panzino's claim for breach of contract. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). Here, the parties dispute whether Whalen and 5Church breached sections 3.12(c), 5.2, and 8.4 of the operating agreement.

### 1. Section 3.12(c)

25.    It is undisputed that Panzino was never offered an opportunity to invest in Sophia's Lounge. Panzino claims that this amounts to a breach of section 3.12(c), which gives 5Church's initial shareholders a right of first refusal to invest in "a second business to be opened after the commencement of this business." (Operating Agrmt. § 3.12(c).) Whalen and 5Church argue that Sophia's Lounge was the fifth business opened, not the second. (*See* Defs.' Br. in Supp. 14–15.) Panzino interprets section 3.12(c) as a right of first refusal to invest "in all future restaurant businesses created by the 5Church restaurant group," including Sophia's Lounge. (Pl.'s Opp'n 18.)

26.    Faced with the exact same interpretive dispute in the related *Kamel* case, the federal district court concluded that "[s]ection 3.12(c) is plain and unambiguous." *Kamel*, 2019 U.S. Dist. LEXIS 144287, at *23. "The ordinary meaning of 'second' is '[c]oming next after the first in order, place, rank, time, or quality.'" *Id.* (quoting The

American Heritage Dictionary of the English Language 1582 (5th ed. 2011)) (alteration in original). On that basis, the court rejected the argument that the phrase "second business" includes all future businesses. *See id*. at \*22.

27. This reasoning is persuasive. Contracting parties are free to define the words they use, but when they do not, any nontechnical words are given "their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." *Singleton v. Haywood Elec. Membership Corp.*, 357 N.C. 623, 629, 588 S.E.2d 871, 875 (2003) (citation and quotation marks omitted). The phrase "second business" is neither technical nor defined in the operating agreement. It must be given its ordinary meaning.

28. Contrary to settled rules of contract interpretation, Panzino calls on extrinsic evidence to show that section 3.12(c) is ambiguous. The role of extrinsic evidence is to clarify ambiguities not to create them. Panzino makes no effort to show that the ordinary meaning of "second business" includes all future businesses, whether second or twenty-second in the queue. Thus, section 3.12(c) is not ambiguous, and it would be error to "consult extrinsic evidence." *Ludlam v. Miller*, 225 N.C. App. 350, 365, 739 S.E.2d 555, 564 (2013); *see also Atl. & E. Carolina Ry. Co. v. Wheatly Oil Co.*, 163 N.C. App. 748, 752, 594 S.E.2d 425, 429 (2004) ("When the language of a written contract is plain and unambiguous, the contract must be interpreted as written and the parties are bound by its terms." (citation and quotation marks omitted)); *Glover v. First Union Nat'l Bank of N.C.*, 109 N.C. App. 451, 456, 428 S.E.2d 206, 209 (1993) ("An ambiguity exists where the language of a contract is

fairly and reasonably susceptible to either of the constructions asserted by the parties.").

29. Under the plain language of section 3.12(c), Panzino had no right of first refusal to invest in Sophia's Lounge. It is undisputed that Nan & Byron's, not Sophia's Lounge, was the second business opened after the 5Church Charlotte restaurant. (*See* Defs.' Ex. C 132:24–133:2, 148:15–149:2.) Whalen and 5Church are therefore entitled to summary judgment dismissing the claim for breach of section 3.12(c).

2. Section 5.2

30. Section 5.2 governs distributions to 5Church's shareholders. As relevant, the section requires 5Church's manager to "make a distribution of Distributable Cash monthly" unless the distribution would compromise the company's capital reserves. (Operating Agrmt. § 5.2(a).) Panzino claims that Whalen and 5Church breached section 5.2 by making only sporadic distributions between February 2016 and April 2017, when Panzino sold his shares. (*See* Pl.'s Opp'n 3–5.) Whalen and 5Church argue that summary judgment is appropriate because Panzino has not shown any evidence of damages. (*See* Defs.' Br. in Supp. 20–22.)

31. "Under North Carolina law, proof of damages is not an element of a claim for breach of contract." *Crescent Univ. City Venture, LLC v. AP Atl., Inc.*, 2019 NCBC LEXIS 46, at *127 (N.C. Super. Ct. Aug. 8, 2019) (citation omitted). Rather, "in a suit for damages for breach of contract, proof of the breach would entitle the plaintiff to nominal damages at least." *Delta Envtl. Consultants, Inc. v. Wysong & Miles Co.*, 132

N.C. App. 160, 172, 510 S.E.2d 690, 698 (1999) (citation and quotation marks omitted). On that basis, our Court of Appeals has stressed that it would be error to enter summary judgment based on a failure to offer evidence of damages. *See Hodges v. Young*, 2011 N.C. App. LEXIS 370, at *6 (N.C. Ct. App. Mar. 1, 2011) (unpublished).

32. If Panzino proves at trial that Whalen and 5Church did not make monthly distributions when required to do so, he would be entitled to nominal damages even without proof of actual damages.[4] The Court therefore denies the motion for summary judgment as to the alleged breach of section 5.2.

3. Section 8.4

33. Panzino also claims a breach of his rights under section 8.4, which requires 5Church to deliver certain financial statements to its shareholders every month. (*See* Operating Agrmt. § 8.4(a).) It is undisputed that these reports were not delivered monthly while Panzino was a shareholder. (*See* Pl.'s Ex. G 45:23–46:3, ECF No. 30.8; Pl.'s Ex. A 52:17–24.) Even so, Whalen and 5Church argue that summary judgment should be entered because Panzino lacks standing to assert a claim based on section 8.4 and because, if he does have standing, he has offered no evidence of damages flowing from the alleged breach. (*See* Defs.' Br. in Supp. 16–20.)

34. As to standing, both sides start with the familiar rule that a shareholder may not bring an individual cause of action to recover a loss of value to his or her

---

[4] At the hearing, counsel for Whalen and 5Church argued that Panzino will not be able to make this showing at trial. If so, the claim may be subject to a motion for directed verdict. But the Court declines to consider the issue at this stage because the motion, briefing, and evidence are all geared toward Panzino's ability to prove damages and the sufficiency of his evidence as to breach was not clearly raised as a ground for summary judgment. (*See* Defs.' Mot. Summ. J. 2.)

shares caused by a wrong done to the corporation, unless the shareholder was owed some special duty or suffered some special injury. (*See* Defs.' Br. in Supp. 16; Pl.'s Opp'n 21.) It is a correct statement of law. *See Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658–59, 488 S.E.2d 215, 219 (1997). But it is irrelevant because Panzino's claim for breach of section 8.4 does not involve any wrong done to 5Church. The text makes this clear. Section 8.4 requires "*[t]he Company* [to] deliver to the Members" the relevant financial statements. (Operating Agrmt. § 8.4(a) (emphasis added).) In other words, this section imposes an obligation on 5Church to deliver information to its shareholders and grants to those shareholders a corresponding right to receive information. By pursuing a claim for breach of section 8.4, Panzino seeks to enforce his own rights, not those of 5Church. He therefore has standing to assert an individual claim for relief, and the *Barger* framework simply does not apply.[5] *See 759 Ventures, LLC v. GCP Apt. Inv'rs, LLC*, 2018 NCBC LEXIS 82, at *9–11 (N.C. Super. Ct. Aug. 13, 2018) (concluding that plaintiff had standing to bring direct claim for breach of operating agreement).

35.   Likewise, it is not relevant at this stage whether Panzino has evidence of damages from the alleged breach. As noted, damages are not an element of a claim for breach of contract. Whalen and 5Church are not entitled to summary judgment as to the alleged breach of section 8.4. *See Hodges*, 2011 N.C. App. LEXIS 370, at *6.

---

[5] The Court has occasionally cautioned against a reflexive application of *Barger*. *See, e.g.*, *Bennett v. Bennett*, 2019 NCBC LEXIS 19, at *13 n.5 (N.C. Super. Ct. Mar. 15, 2019); *Atkinson*, 2015 NCBC LEXIS 21, at *15 n.3.

36. Given this disposition, the Court need not address the motion to strike evidence of damages attached to Panzino's brief in opposition. That motion is moot. Whalen and 5Church are, of course, free to address that evidence through a motion in limine in advance of trial.

### C. Equitable Accounting

37. Last, Panzino represents that he is no longer pursuing his claim for equitable accounting. Accordingly, the motion for summary judgment is granted as to this claim.

### III.
### CONCLUSION

38. For these reasons, the Court **GRANTS** in part and **DENIES** in part the motion for summary judgment:

  a. The Court **GRANTS** the motion for summary judgment as to the claim for breach of fiduciary duty and constructive fraud, the claim for breach of contract as to section 3.12(c) of 5Church's operating agreement, and the claim for equitable accounting. These claims are **DISMISSED** with prejudice.

  b. The Court **DENIES** the motion for summary judgment as to the claim for breach of contract as to sections 5.2 and 8.4 of 5Church's operating agreement.

  c. The Court **DENIES** the motion to strike as moot.

39. Within seven days of this Order, counsel for the parties shall meet and confer as to the anticipated length of trial and submit a joint status report via e-mail to the law clerk assigned to this case.

**SO ORDERED**, this the 12th day of February, 2020.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases